United States District Court
Southern District of Texas
ENTERED
September 28, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MARGO HINOJOSA, *Plaintiff,* | § § § | |
| v. | § | Civil No. 5:25-CV-00145 |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, *Defendant.* | § § § § § | |

**MEMORANDUM AND ORDER**

This appeal arises from the Commissioner's denial of Plaintiff Margo Hinojosa's claim for disability insurance benefits under the Social Security Act. This Court has jurisdiction to review the Commissioner's final decision under Section 205(g) of the Social Security Act. 42 U.S.C. § 405(g). Both parties consented to the adjudication of this administrative appeal by the undersigned Magistrate Judge. Dkt. Nos. 7–8, 12[1]; *see* 28 U.S.C. § 636(c).

Plaintiff raises two issues. First, she contends that the Administrative Law Judge ("ALJ") erred by improperly formulating her mental residual functional capacity ("RFC") without a medical opinion addressing her mental functional limitations and by not ordering a consultative examination to further develop the record. Dkt. No. 10 at 10–17. Second, Plaintiff argues that the RFC is internally

[1] The Court uses the page numbers auto-generated by Case Management/Electronic Case Files in its citations to docket entries.

inconsistent because it precludes jobs requiring forced and fast-paced quotas while stating that she may nevertheless perform work involving quotas. *Id.* at 18–20.

Having considered Plaintiff's Motion for Summary Judgment, Dkt. No. 10; the Commissioner's Cross-Motion for Summary Judgment, Dkt. No. 17; Plaintiff's Reply, Dkt. No. 18; and the administrative record filed with the Commissioner's Answer, Dkt. No. 9, the Court finds no reversible error. The ALJ did not err in formulating Plaintiff's mental RFC, and the determination is supported by substantial evidence. Nor does the ALJ's inclusion of a pace restriction render the RFC finding internally inconsistent.

Accordingly, the Commissioner's final decision is **AFFIRMED**; the Commissioner's Cross-Motion for Summary Judgment, Dkt. No. 17, is **GRANTED**; and Plaintiff's Motion for Summary Judgment, Dkt. No. 10, is **DENIED**.

## *I. Factual and Procedural Background*

On March 12, 2022, Plaintiff[2] filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning February 27, 2022. Dkt. Nos. 10 at 5, 17 at 4. She later amended the alleged onset date to May 1, 2023. Dkt. No. 10 at 5. The claim initially identified multiple sclerosis, acute left-sided weakness, and benign hypertension as disabling conditions. Dkt. No. 17 at 5. Her medical record subsequently documented treatment for depression, anxiety, hallucinations, and related mental-health symptoms. Dkt. No. 10 at 13. Plaintiff's

[2] Plaintiff was 39 years old when her claim was denied by the ALJ. She has at least a high-school education and previously worked as a retail store manager. Dkt. No. 10 at 5.

applications were denied initially and again upon reconsideration, however she was granted a hearing before an ALJ on November 14, 2023. Dkt. No. 9-4 at 25. In the initial decision dated January 16, 2024, the ALJ found that Plaintiff was not disabled between May 1, 2023, and the date of the decision. *Id.* at 26. Plaintiff requested review of the ALJ's decision, and the Appeals Council vacated the decision and remanded the case. Dkt. No. 9-3 at 20. A second hearing before the same ALJ took place on October 31, 2024, and in a decision dated December 27, 2024, the ALJ again denied Plaintiff's claim, finding Plaintiff not disabled between May 1, 2023, and the date of the decision. *Id.* at 21. The Appeals Council denied Plaintiff's request for review of the ALJ's decision. Dkt. No. 9-3 at 4. Thus, the December 27, 2024, decision became the final decision of the Commissioner. The present appeal follows the Appeals Council's denial.

Although Plaintiff's disability application emphasized her physical limitations, her present appeal principally concerns the mental component of her RFC.

### A. Relevant Medical and Other Evidence

Plaintiff's mental-health treatment history began in February 2023 when Plaintiff's treating neurologist referred her to Border Region Behavioral Health Center for mental-health counseling. Dkt. No. 9-8 at 358–59. By July 2023, Plaintiff was a Border Region client in the Adult Mental Health Program where she received a diagnosis of major depressive disorder, recurrent episode, with psychotic features; generalized anxiety disorder; moderate alcohol use disorder; and mild cocaine use disorder in early remission. Dkt. No. 9-9 at 123–24. The assessment recorded

"Residual Symptoms" and a "Fair" prognosis. *Id.* at 123. The accompanying history documented Plaintiff's self-reports of depression, anxiety, paranoia, auditory and visual hallucinations, difficulty sleeping, irregular appetite, alcohol use, and prior cocaine use. *Id.* at 123–24. It also noted that Plaintiff had been taking Zoloft prescribed by her primary care provider since February 2023. *Id.* at 123; *see* Dkt. No. 9-8 at 359.

In August 2023, a Border Region nurse practitioner ("NP") examined Plaintiff and reported her adherence to her medications without side effects. Dkt. No. 9-9 at 121. Plaintiff reported daily depression and sadness, an irritable mood, difficulty concentrating, forgetfulness, chronic fatigue, and fair motivation, while describing her sleep and appetite as improved. *Id.* She also reported auditory hallucinations consisting of mumbling voices or noises and visual hallucinations described as spirits. *Id.* at 121–22. However, she denied command hallucinations, delusions, and suicidal or homicidal thoughts partly because she had achieved drug and alcohol sobriety. *Id.* Plaintiff was well groomed, maintained good hygiene, and wore attire appropriate to the situation. *Id.* at 121. She was engaging and cooperative, maintained good eye contact, and exhibited spontaneous speech of normal volume but slow rate. *Id.* at 122. Her mood was anxious and depressed. *Id.* Her thought process was relevant and logical, but slowed, and ruminations were noted. *Id.* The NP assessed partial insight and good judgment. *Id.* Her treatment plan continued Zoloft at 150 milligrams daily, started Abilify at 5 milligrams daily for mood and psychosis, increased hydroxyzine for anxiety or insomnia. *Id.* at 122–25. Cognitive behavioral therapy ("CBT") and

substance-use counseling were recommended with referrals provided. *Id.* at 125. Neither acute psychiatric hospitalization nor placement in a crisis-stabilization unit was recommended. *Id.*

Contemporaneous examinations outside Border Region also documented matters relevant to Plaintiff's cognitive and communicative functioning. During a neurologist visit in October 2023, Plaintiff denied memory loss, although the examination showed slowed speech, mild dysarthria, and unspecified depression. Dkt. No. 9-8 at 389, 393. Her functional assessment identified bathing, dressing, toileting, transferring, continence, and feeding as independent. *Id.* at 393. Plaintiff was cooperative with the examination, maintained good eye contact, and displayed thought content without suicidal ideation or delusions. *Id.* at 388–89. She was alert and oriented, and her general knowledge and judgment were within normal variation. *Id.* at 388. Three days later, Plaintiff returned to Border Region where the NP recorded similar examination findings and assessments. Dkt. No. 9-10 at 75–79. Plaintiff underwent a mental health screening in December 2023 to address her reports of hallucinations. *Id.* at 72. At the time of the assessment, she reported no delusions or hallucinations and her "thoughts [were] logical and coherent." *Id.* at 73.

The record also contains differing observations concerning Plaintiff's memory in 2023. In November 2023, Plaintiff complained of memory loss for six months and reported difficulty retaining information. Dkt. No. 9-9 at 150. But a neurological exam showed that in her cortical functions, she was "alert and oriented x 4, general knowledge and judgement within normal variation." *Id.* at 151. Later in December,

she presented again at Border Region after passing out from drinking and was encouraged to get back into substance abuse and counseling. Dkt. No. 9-10 at 67. She appeared depressed but her thought process was logical with "[n]o observed hallucination or indication of delusions at time of interview." *Id.* at 68. She was "[a]lert-oriented to person, place, and situation" and displayed "intact [short-term] & [long-term] memory," average intelligence, and a "[f]und of knowledge appropriate to her educational [and] sociocultural background." *Id.*

Border Region records in 2024 reflected similar findings across visits with some changes over time. At visits in February and July, Plaintiff was observed with normal speech, relevant and logical thought processes at a normal rate, alert consciousness, auditory and visual hallucinations, and an "engaging" and "cooperative" attitude. Dkt. No. 9-10 at 40, 63. The February examination documented an anxious and depressed mood, restricted or constricted affect, paranoid or persecutory delusions, limited insight, and fair judgment. *Id.* at 63. By July, records report Plaintiff remained dysphoric and depressed with flat affect, but no delusions were noted, and insight and judgment were both fair. *Id.* at 40.

In August 2024, Plaintiff participated in CBT with a licensed professional counselor ("LPC"). The LPC recorded that Plaintiff "was oriented to person, time and memory of events, maintained appropriate eye-contact, speech was normal, thought process was logical and coherent and affect was mood congruent." *Id.* at 23. The LPC also reported that Plaintiff "did not express feelings of unreality, audio [or] visual hallucinations [or] delusions." *Id.* A September session recorded similar findings. Dkt.

No. 9-10 at 2–6. There, Plaintiff reported that medication was helping her "balance her mood, stabilize her depression, decrease anxiety and sleep a little better." *Id.* at 6. A separate CBT record on the same date reflected findings similar to prior sessions, including intact memory and orientation. *Id.* at 8.

### B. ALJ Hearings and Findings

On November 14, 2023, the ALJ conducted a telephonic hearing at which Plaintiff's counsel amended the alleged onset date from February 27, 2022, to May 1, 2023. Dkt. Nos. 9-3 at 65–66, 9-4 at 27. At the hearing, Plaintiff testified that she heard voices and saw shadows, but, when asked how those symptoms affected had her work, she responded, "I don't believe that had any interference," explaining that she had been "forcing [herself] physically" and that it was her "physical limitation" which had affected her ability to work. Dkt. No. 9-3 at 78–81. Plaintiff also confirmed that she had remained able to direct her employees and was performing her job "not physically but mentally." *Id.* at 84–85. Following the hearing, on January 19, 2024, the ALJ issued the first unfavorable decision, finding Plaintiff was "not disabled," as defined in the Social Security Act. Dkt. No. 9-4 at 25–35.

The Appeals Council vacated the decision and remanded the case, ordering the ALJ to resolve conflicts between the Dictionary of Occupational Titles and evidence from the vocational expert. Dkt. No. 9-3 at 20. Accordingly, the ALJ held a second hearing on October 31, 2024. *Id.* at 96–122. There, Plaintiff's counsel stated that the record was complete to the best of his knowledge and raised no objection to the admission of exhibits or the qualification of the vocational expert. *Id.* at 99. Plaintiff

testified that she experienced anxiety and depression from dealing with multiple sclerosis and that she "forget[s] things a lot." *Id.* at 108. She further stated that she had "trouble focusing on anything" and attributed that difficulty to "[t]he pain and the dizziness" of her symptoms. *Id.* at 109. The ALJ then asked the vocational expert to consider, among other restrictions, an individual who could understand, remember, and carry out detailed but not complex instructions, have frequent contact with others, tolerate occasional routine changes, and not perform jobs requiring "forced pace quotas, such as assembly line type of work." *Id.* at 115. The ALJ immediately clarified the latter restriction as "yes to quotas, not the fast pace." *Id.* The vocational expert testified that such an individual could not perform Plaintiff's past work but could perform sedentary occupations existing in the national economy. *Id.* at 115–16.

Following remand and the second hearing, the ALJ issued a new unfavorable decision on December 27, 2024. Dkt. No. 9-3 at 20–37. The ALJ applied the five-step sequential evaluation process as prescribed by the Social Security Administration in order to determine whether Plaintiff was disabled. Dkt. No. 9-3 at 23–27. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2023. Dkt. No. 9-3 at 23. At step two, the ALJ found Plaintiff had severe impairments of multiple sclerosis, anxiety disorder, depressive disorder, and obesity, but deemed Plaintiff's degenerative disc disease and hypertension as nonsevere. Dkt. No. 9-3 at 23–24. At step three, however, the ALJ found that no impairment or combination of impairments met or medically equaled a listed impairment.

At step four, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), subject to additional physical and mental limitations. Dkt. No. 9-3 at 26–27. The ALJ found that Plaintiff's symptoms of multiple sclerosis, anxiety disorder, depressive disorder, and obesity to be limiting and incorporated these limitations into her physical and mental RFC assessment. Dkt. No. 9-3 at 34. After reviewing this evidence, the ALJ explained the relationship between the evidence and each mental RFC limitation:

> As for the mental limitations, in balancing the claimant's reports of memory problems against the objective findings of intact memory and a lack of any significant ongoing treatment specifically related to a cognitive deficit, the undersigned has stated that the claimant is able to understand, remember, and carry out detailed but not complex instructions. In order to further reduce workplace stress and to better accommodate the claimant's intermittent slowed movements, and reports of slowed cognitive processing, the undersigned has stated that the claimant cannot perform jobs requiring forced pace quotas such as assembly line type of work; so yes to quotas, not the fast pace. Also, the claimant can tolerate routine changes in the work setting occasionally. Due to the claimant's reports of anxiety and speech problems, as balanced against many findings of cooperative behavior and normal speech, the undersigned has asserted that the claimant is limited to frequent contact with supervisors, frequent contact with co-workers, and frequent contact with the general public.

Dkt. No. 9-3 at 34. Because the ALJ found severe mental impairments that did not meet or medically equal a listed impairment at step three, the step four analysis required a separate assessment of Plaintiff's mental RFC. *See* 20 C.F.R. § 404.1520a(d)(3). This RFC inquiry assessed "the nature and extent" of a claimant's mental limitations and their effect on specific work-related abilities, including understanding, remembering, and carrying out instructions and responding

appropriately to supervisors, coworkers, and workplace pressures. 20 C.F.R. § 404.1545(c); *see* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

Specifically, as to the mental RFC, the ALJ evaluated Plaintiff's ability to follow instructions, interact with others, and maintain an appropriate work pace and adjust to workplace changes. Dkt. No. 9-3 at 34. The ALJ weighed Plaintiff's reported memory problems against medical findings of intact memory and the absence of significant ongoing treatment for a cognitive deficit, limiting Plaintiff to work involving "detailed but not complex instructions." *Id.* The ALJ also weighed Plaintiff's anxiety and reported speech problems against countervailing findings that she was cooperative and had normal speech, finding appropriate an RFC which permitted frequent contact with supervisors, coworkers, and the public. *Id.* And to reduce workplace stress and accommodate Plaintiff's intermittent slowed movements and reported slowed cognitive processing, the ALJ prohibited "forced pace quotas such as assembly line type of work; so yes to quotas, not the fast pace" and found that Plaintiff could tolerate routine changes in the work setting occasionally. *Id.*

In determining Plaintiff's mental RFC, the ALJ highlighted the relevant medical evidence that supported her findings, stating:

> The medical records also show that the claimant had mental health problems. She was noted to have mental health conditions related to anxiety disorder and depressive disorder. Nonetheless, she was not demonstrated to be substantially objectively limited in her mental functioning throughout the period under review, though her mental health issues do warrant some mental functional limitations, as listed above, and as discussed below.

Dkt. No. 9-3 at 31. The ALJ described Plaintiff's mental-health care as "relatively conservative in nature, largely consisting of medication and some outpatient counseling." *Id.* at 32. The ALJ further noted that Plaintiff was not psychiatrically hospitalized during the period under review. *Id.* In sum, "[h]er objective mental/psychiatric statuses were largely normal overall during the course of her longitudinal examinations, though there were some fluctuations, especially in mood and/or affect, but she had many findings of normal moods/affects." *Id.*

The ALJ also reviewed the evidence concerning memory and concentration in detail, explaining that Plaintiff" did not receive any significant ongoing treatment specifically related to a cognitive deficit" and that Plaintiff "largely denied having memory loss during her examinations. Dkt. No. 9-3 at 32. However, even though the ALJ did "acknowledge some subjective complaints of memory loss" she found during Plaintiff's examinations that Plaintiff's "memory was largely objectively intact" and Plaintiff was "was largely objectively alert and/or oriented," despite Plaintiff's reports of concentration troubles, sleep problems, and fatigue. *Id.* She further acknowledged "at least one finding of a ruminating thought process, and some examinations showing slowed speech and movement"—including mild dysarthria—but nonetheless noted there were "many findings of normal speech as well." *Id.* Although Plaintiff's records also included three medical opinions, these primarily covered Plaintiff's physical limitations and were, in any event, deemed unpersuasive by the ALJ.[3] Dkt.

---

[3] The three medical opinions came from two state agency medical consultants who evaluated Plaintiff's medical records at the initial and reconsideration levels, and Plaintiff's primary care physician. *See* Dkt. No. 10 at 6.

No. 9-3 at 33–34.

## *II. Legal Standards*

### A. Standard of Review

Section 405(g) governs judicial review of the Commissioner's final decision and provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court has explained that, under this standard, the reviewing court examines the existing administrative record for sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). The evidentiary threshold "is not high"; substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The Fifth Circuit applies an "exceedingly deferential" standard when reviewing Social Security disability claims. *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). Judicial review asks only whether the Commissioner's final decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards to evaluate the evidence. *Madkins v. Bisignano*, 150 F.4th 657, 662 (5th Cir. 2025) (per curiam). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). A reviewing court therefore "does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even

if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B. Development of the Record**

The ALJ has "a duty to fully and fairly develop the facts." *Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015). That duty extends to developing "all relevant facts," rather than "collecting all existing records." *Id.* at 509. Accordingly, the inquiry is whether the ALJ obtained the information necessary to make the disability determination. *See id.* Where the record contained "ample objective and opinion evidence supporting the ALJ's conclusions," the Fifth Circuit held that the ALJ was not required to obtain additional records from a treating physician. *Jones v. Astrue*, 691 F.3d 730, 733–34 (5th Cir. 2012).

Social Security regulations separately provide that the agency "may purchase a consultative examination" when the evidence is inconsistent or "insufficient to allow [the agency] to make a determination or decision" on a claim. 20 C.F.R. § 404.1519a(b). However, a "consultative examination is required to develop a 'full and fair record' only if 'the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision.'" *Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) (quoting *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016)). Thus, where the record was "replete with medical documents that spanned years" and "[n]othing in the record suggest[ed] that the ALJ needed any more medical information to reach an informed decision," the Fifth Circuit found no error in declining to order a consultative examination. *Id.*

Under Fifth Circuit precedent, reversal for inadequate development of the record requires the claimant to show "(1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). "To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'" *Id.* (quoting *Kane*, 731 F.2d at 1220). "The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error. A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden." *Jones*, 691 F.3d at 734–35.

## *III. Discussion*

Plaintiff argues that the ALJ erred by "playing doctor" when formulating a mental RFC without a medical opinion. Dkt. No. 10 at 10. Although Plaintiff's record included the opinions of two state medical consultants, and her own primary doctor, these opinions—which the ALJ did not find persuasive—focused on Plaintiff's physical limitations and did not address Plaintiff's mental limitations. *Id.* at 10–11; Dkt. No. 17 at 6 ("The record did not contain any prior administrative findings or medical opinions regarding Plaintiff's mental limitations."). Plaintiff further argues that the ALJ failed to develop the record as to the effect Plaintiff's mental limitations have on her ability to function in the workplace, and the ALJ erred by not ordering a consultative examination. Dkt. No. 10 at 13–17. Last, Plaintiff argues that the RFC the ALJ crafted was internally inconsistent. Dkt. No. 10 at 18–21. Each of these

points of error, Plaintiff asserts, are grounds for vacating and remanding the ALJ's decision for further proceedings.

**A. Disability Determinations**

Under Title II of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment… which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner evaluates disability through a five-step sequential inquiry addressing whether the claimant: (1) engages in substantial gainful activity; (2) has a severe impairment; (3) has an impairment meeting or medically equaling a listed impairment; (4) can perform past relevant work; and (5) can perform other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002); 20 C.F.R. § 404.1520(a)(4). A determination of disability or nondisability at any step ends the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden through the first four steps; at step five, the burden shifts to the Commissioner to establish that the claimant can perform other work existing in the national economy and is therefore not disabled. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam).

Mental impairments require an additional framework. 20 C.F.R. § 404.1520a. At steps two and three, the Commissioner rates limitation in four broad areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(3). These criteria generally require an extreme limitation in one area or marked limitations in two. *Miranda v. Kijakazi*, No.

H-21-1029, 2022 WL 4359230, at *5 (S.D. Tex. Aug. 29, 2022) (report and recommendation). If a severe mental impairment neither meets nor medically equals a listing, the analysis proceeds to a separate RFC assessment. 20 C.F.R. § 404.1520a(d)(3).

The RFC assessment is "based on all of the relevant medical and other evidence," and the regulations require consideration of "any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations." 20 C.F.R. § 404.1545(a)(3). In making a claimant's RFC assessment, "an ALJ examines the medical evidence in the record, including the testimony of physicians and the claimant's medical records." *Webster*, 19 F.4th at 718.

**1. A Medical Opinion Was Not Required for the ALJ to Determine Plaintiff's Mental RFC**

Plaintiff claims the RFC assessment must rely on "a medical provider's opinion of the Plaintiff's mental functional limitations." Dkt. No. 10 at 11. For the ALJ to craft an RFC without such a medical opinion, Plaintiff argues, the ALJ is impermissibly "playing doctor." However, Plaintiff's argument rests wholly on a footnote from a non-binding, unpublished case: *Williams v. Astrue*. 355 F. App'x 828, 832 n.6 (5th Cir. 2009) (per curiam). Not only are the facts from *Williams* distinguishable from the instant case, the *Williams* footnote itself cites to *Ripley v. Chater* for a proposition that is no longer supported by the current regulations.

**a. Pre-2017 Regulatory Framework**

One precedential Fifth Circuit decision frames the discussion on whether as a matter of law an ALJ must rely on medical opinions[4] to craft an RFC: *Ripley v. Chater*, 67 F.3d 552, 557–58 (5th Cir. 1995), which considered an RFC determination made without a medical source statement. Although *Ripley* did not make the absence of a medical opinion dispositive, it ultimately found a lack of substantial evidence due to the absence of one.

In *Ripley*, the Fifth Circuit considered whether the ALJ had fully developed the record in concluding that the plaintiff "was capable of performing sedentary work, even though there was no medical testimony supporting this conclusion." 67 F.3d at 557. In crafting its opinion, the Fifth Circuit discussed medical opinions within the regulatory framework of 1995—the year when the decision was issued—citing to the 1994 version of 20 C.F.R. § 404.1513(b)(6): "The medical reports that are reviewed during the administrative hearings should include '[a] statement about what you can still do despite your impairment(s) based upon the medical source's findings." *Id.* at 557 n.23. "Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of a medical source statement will not make the report incomplete.'" *Id.* at 557 n.24. The Fifth Circuit stated that in situations "where no medical statement has been provided, [the Court's] inquiry focuses upon whether the decision of the ALJ is supported by substantial evidence in

[4] As defined in the Code of Federal Regulations, a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions." 20 C.F.R. § 404.1513(a)(2).

the existing record." *Id.* at 557. Pointing to the absence of "reports from qualified medical experts" in finding a lack of substantial evidence, the Fifth Circuit remanded the case for additional proceedings and ordered that a report from a treating physician be obtained. *Id.* at 557 n.27, 558.

**b. Current Regulatory Framework (2017–Present)**

The regulatory framework underlying *Ripley* has since changed. *Ripley* expressly relied on § 404.1513(b)(6) (1994), which stated that medical reports should contain a medical source statement while also providing that its absence did not render the report incomplete. 67 F.3d at 557 nn.23–24. At the time, disability determinations followed a medical opinion hierarchy: Examining-source opinions generally received more weight than non-examining-source opinions, treating-source opinions generally received more weight than non-treating-source opinions, and a qualifying treating-source opinion received controlling weight. 20 C.F.R. § 404.1527(d)(1)–(2) (1994).

That hierarchy among medical opinions does not govern the review of Plaintiff's disability claim. Plaintiff filed her disability application on March 12, 2022. Dkt. No. 10 at 5. The rules governing claims filed on or after March 27, 2017, therefore apply. *See* 20 C.F.R. § 404.1520c. Under these current rules, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a); *Webster v. Kijakazi*, 19 F.4th 715, 718–19 (5th Cir. 2021) ("Notably, though, ALJs are no longer required to give controlling

weight to a treating physician's opinion, as was mandated by federal regulations and our caselaw in the past.”).

As medical opinions are just one of several categories of evidence the ALJ considers in making RFC determinations, even when the record lacks an opinion “describing the types of work that the applicant is still capable of performing,” “[t]he absence of such a statement… does not, in itself, make the record incomplete.” *Wills v. Kijakazi*, No. 22-20609, 2023 WL 4015174, at *3 (5th Cir. June 14, 2023) (quoting *Ripley*, 67 F.3d at 557). “An administrative record is not per se incomplete without a medical opinion about a claimant's limitations, so long as it otherwise contains substantial evidence to make the RFC assessment.” *Vasquez v. O'Malley*, No. 24-5-233, 2024 WL 4381269, at *2 (5th Cir. Oct. 3, 2024) (per curiam); *see also Myers v. Saul*, No. SA-20-CV-00445-XR, 2021 WL 4025993, at *8 (W.D. Tex. Sep. 3, 2021); *Jones v. Berryhill*, No. 17-5324, 2018 WL 1325851, at *13 (E.D. La. Feb. 23, 2018) (“No Fifth Circuit case, including the binding decision in *Ripley*, has stated that a positive statement or positive evidence from a medical source is always required for an ALJ to assess residual functional capacity.”) (quotation marks omitted)*; but see Kobrock v. Social Security Administration*, No. 23-256, 2023 WL 8370366, at *8 (E.D. La. Sep. 4, 2023) (interpreting that in the Fifth Circuit an RFC determination lacks substantial evidence if it is not supported by any medical opinion and is instead based on the ALJ's lay interpretation of raw medical data) (collecting cases).

Nor does the absence of a mental-function opinion, standing alone, require an ALJ to order a consultative examination. The relevant question remains whether

there is substantial evidence in the record to support an informed decision. *See Webster*, 19 F.4th at 720 ("Nothing in the record suggests that the ALJ needed any more medical information to reach an informed decision about whether Webster was disabled. The ALJ's decision was based upon substantial evidence in a sufficiently developed record, and he did not err in declining to order the [consultative examination]."); *Vasquez*, 2024 WL 4381269, at *2 ("On this record, we agree with the district court that the ALJ was not obliged to seek a medical opinion to assess Vasquez's RFC or to develop the record any further."); *Carol B. v. Kijakazi*, No. 4:23-CV-03484, 2025 WL 492500, at *5 (S.D. Tex. Jan. 24, 2025) ("*Ripley* does not stand for the proposition that an ALJ must always obtain a medical opinion, or that an ALJ cannot formulate an RFC without one."). "Rather, the ALJ must assess a claimant's RFC based on all relevant record evidence." *Id.*

**c. The ALJ Did Not Play Doctor When Determining Plaintiff's RFC**

The *Ripley* Court was clear that the absence of a "medical source statement describing the types of work that the applicant is still capable of performing" "does not, in itself, make the record incomplete." 67 F.3d at 557. The Court in *Williams*, however, narrowed the holding in *Ripley*, noting in a footnote "that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions." 355 F. App'x at 832 n.6. Plaintiff characterizes this as the ALJ "playing doctor," alleging that the ALJ "substitute[d] her lay opinion for that of a medical expert." Dkt. No. 10 at 10; *see, e.g. Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (quoting *Schmidt*

*v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (Posner, J.)). However, even assuming it is improper for the ALJ to "play doctor" in formulating an RFC, the ALJ in the present case did no such thing when determining Plaintiff's mental limitations.

In *Williams*, there were medical opinions from each of Williams's three treating physicians supporting Williams's claimed limitations. 355 F. App'x at 829. The ALJ refused to give controlling weight to these three opinions when creating the RFC. *Id.* at 831. Instead, the ALJ looked at the remaining medical evidence and observed that the plaintiff had "'only mild to moderate stenosis' in her lumbar spine and 'only posterior spurring' in her cervical spine." *Id.* The Fifth Circuit noted that the ALJ acknowledged that the plaintiff had undergone successful physical therapy but then "failed to consider the physical therapy discharge summary, which stated that Williams—despite improving her range of motion in physical therapy—could still only stand for thirty minutes after completing her treatment." *Id.* at 831–32. Thus, the court found that "the ALJ impermissibly relied on his own medical opinions as to the limitations presented by 'mild to moderate stenosis' and 'posterior spurring' to develop his factual finding." *Id.* at 32. An ALJ does not implicitly "play doctor" when she determines a claimant's physical or mental limitations without relying on the opinion of a medical expert when crafting an RFC assessment.

It is true that "lay intuitions about medical phenomena are often wrong." *Frank*, 326 F.3d at 622. That is why courts have often found it improper for ALJ's to extrapolate limitations from medical diagnoses. *E.g.*, *id.* at 623 (ALJ deciding claimant would be exhibiting muscle atrophy if symptoms were as described);

*Kenneth S. v. Saul*, No. 3:18-CV-2450-L-BN, 2019 WL 3881618 (N.D. Tex. July 31, 2019) (ALJ interpreting impact of diabetic retinopathy); *Schmidt*, 914 F.2d 117 (ALJ finding heart condition not disabling). However, an ALJ is required to examine and weigh the evidence in the record. *Webster*, 19 F.4th at 719 (In creating an RFC, "an ALJ examines the medical evidence in the record, including the testimony of physicians and the claimant's medical records."). Although an ALJ must be careful not to play doctor, she does not do so every time there is no direct medical opinion upon which to base an RFC determination. Otherwise, *Ripley*'s holding—"[t]he absence of such a statement, however, does not, in itself, make the record incomplete"—would be meaningless. 67 F.3d at 557.

Plaintiff cites to *Williams* for the premise "that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams*, 355 Fed. App'x. at 832 n.6; Dkt. No. 10 at 10. But, as noted above, *Williams* does not stand for the proposition that an opinion by a medical expert is required when an ALJ creates an RFC, and such a reliance on this interpretation muddies the waters of the landscape of SSA disability cases. Plaintiff is not alone in her take on *Williams*, as it is often cited for holdings requiring medical opinions in RFC determinations. *See, e.g.*, *Tiede v. Dudek*, 770 F. Supp. 3d 965, 971 (W.D. Tex. 2025); *Sprowl v. Comm'r of Soc. Sec.*, 794 F. Supp. 3d 477, 485 (W.D. Tex. 2025); *Trevino v. O'Malley*, No. 2:241-CV-00177, 2025 WL 2024506, at *7

(S,D, Tex. June 16, 2025); *Thomas v. Comm'r of Soc. Sec.*, No. 3:20-CV-679-TSL-RPM, 2022 WL 3209316, at *3 (S.D. Miss. July 22, 2022); *Morgan v. Kijakizi*, No. 4:20-CV-02555, 2021 WL 6072594, at *3 (S.D. Tex. Dec. 23, 2021). However, the Fifth Circuit has clarified in recent cases that "medical opinions are just one of several categories of evidence the ALJ considers in making RFC determinations." *Wills*, 2023 WL 4015174, at *3; *Vasquez*, 2024 WL 4381269, at *2 ("An administrative record is not per se incomplete without a medical opinion about a claimant's limitations, so long as it otherwise contains substantial evidence to make the RFC assessment."). "Courts have upheld RFCs formed without a persuasive medical opinion when the ALJ relied on medical records—including treatment notes, examinations and procedures, and test results." *A.C. v. Bisignano*, No. 4:25-CV-03028, 2026 WL 2816764, at *4 (S.D. Tex. Aug. 31, 2026).

Regardless, Plaintiff's reliance on *Williams* is misplaced. In this case, unlike *Williams*, there was no disregarded medical opinion that directly spoke to Plaintiff's disputed limitations. Yet, even in *Williams* (and *Ripley*), it was not the lack of medical opinion evidence which the court found improper. It was instead the lack of any evidence at all. Here, the ALJ properly formulated the RFC based on substantial evidence, including a well-documented series of mental health visits and Plaintiff's own testimony about her self-reported functional limitations. The ALJ did not "play doctor."

### B. The ALJ Adequately Developed the Record

Plaintiff argues that "everything the Commissioner points to merely establishes that the Plaintiff has mental health problems." Dkt. No. 18 at 4. This is simply not true. Despite the absence of a medical opinion on Plaintiff's mental function, there was substantial evidence in the record to support the ALJ's mental RFC determination, including longitudinal observations contained in recurring assessments carried out by Plaintiff's mental health providers. Dkt. Nos. 9-10 at 3–10, 23, 40, 47–51, 63, 68, 75–79. Furthermore, Social Security regulations require the RFC to be assessed from "all of the relevant medical and other evidence," not solely from medical opinions. 20 C.F.R. § 404.1545(a)(3).

#### 1. Substantial Evidence Existed to Support the ALJ's RFC Determination

Here, the ALJ relied on treatment records from medical sources who examined and treated Plaintiff at Border Region Behavioral Center including advanced practice registered nurses,[5] a licensed professional counselor[6], and other treating providers. These providers rendered mental health diagnoses and documented her treatment, response, and prognosis alongside mental status exams covering observations about her mood, thought content, perception, memory, orientation, insight, and judgment.

[5] At Border Region advance nurse practitioners treated Plaintiff and recorded their observations from the visits. Dkt. No. 9-10 at 3–7, 9, 40, 47–51, 63, 75–79. These nurses qualify as "acceptable medical source[s]" as a "[l]icensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title." 20 C.F.R. § 404.1502(a)(7).

[6] At Border Region, Plaintiff was also treated by a licensed professional counselor, who falls within the broader definition of a "medical source" as an individual "licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d); Dkt. No. 9-10 at 8, 10, 23.

These records span more than a year from August 2023 through September 2024 and contain medical evidence relevant to Plaintiff's mental and cognitive functioning. Dkt. Nos. 9-9 at 121–126, 9-10 at 3–79; *see* 20 C.F.R. §§ 404.1502(f)–(g), 404.1513(a)(1), (3). Drawing from these records, the ALJ evaluated Plaintiff's mental-health treatment longitudinally and concluded that it was "relatively conservative in nature, largely consisting of medication and some outpatient counseling," and that her "objective mental/psychiatric statuses were largely normal overall during the course of her longitudinal examinations," although "there were some fluctuations, especially in mood and/or affect." Dkt. No. 9-3 at 32; *see* Dkt. Nos. 9-3 at 32–33; 9-10 at 3–7, 47–51, 75–79.

As Plaintiff points out, the last recorded exam occurred just six weeks before the final ALJ hearing on October 31, 2024. Dkt. No. 10 at 13. Contrary to Plaintiff's assertion that the ALJ disregarded her reported mental status from the September 2024 examination, the ALJ expressly considered it in the no-disability decision. Dkt. No. 9-3 at 33. The ALJ discussed that Plaintiff reported daily depression and sadness, chronic fatigue, anxiety, trauma, and auditory and visual hallucinations. Dkt. Nos. 9-3 at 33; 9-10 at 3–5. But Plaintiff also reported medication adherence without side effects, improved sleep, and was attending counseling. Dkt. Nos. 9-3 at 33; 9-10 at 3–5. Upon examination, Plaintiff was well groomed, engaged, cooperative, and alert; maintained good eye contact; displayed normal speech and "relevant and logical thought processes"; and had "fair" insight and judgment. Dkt. Nos. 9-3 at 33; 9-10 at 3–5. Plaintiff had been sober one year from alcohol and was not currently using

cocaine or unprescribed pills. Plaintiff's September 2024 exam concluded with an assessment of "baseline" progress and "fair" prognosis. *Id.*

The ALJ also found that Plaintiff's "memory was largely objectively intact when addressed during her examinations." Dkt. No. 9-3 at 32. This finding reflected assessments by Plaintiff's treatment providers. Dkt. No. 10 at 13. Plaintiff also attended psychotherapy appointments using CBT that assessed her memory and other aspects of her mental status. Dkt. No. 9-10 at 8. During an August 2024 appointment, Plaintiff was "oriented to person, time and memory of events," maintained appropriate eye contact, displayed normal speech, and exhibited a "logical and coherent" thought process. *Id.* at 23. An earlier December 2023 assessment also described Plaintiff as "[a]lert-oriented to person, place, and situation" with "intact [short-term] & [long-term] memory." *Id.* at 68. These records also support the ALJ's finding that Plaintiff was "largely objectively alert and/or oriented during her examinations." Dkt. No. 9-3 at 32; *see* Dkt. No. 9-10 at 3–5, 8, 23, 47–51, 68, 75–79. Accordingly, the treatment notes that Plaintiff identifies as part of Exhibit 14F were largely reflected in the ALJ's longitudinal analysis. *See* Dkt. Nos. 10 at 13; 9-3 at 32; 9-10 at 3–5, 8, 23, 47–51, 68, 75–79.

The ALJ also observed that Plaintiff "had many findings of normal speech." Dkt. No. 9-3 at 32. For example, during a September 2024 therapy session, the LPC documented that Plaintiff's "speech was normal" and recorded the results of the Patient Health Questionnaire and Generalized Anxiety Disorder-7 assessments. Dkt. No. 9-10 at 10. An October 2023 examination likewise included an assessment of

Plaintiff's speech and broader mental status. *Id.* at 75–76. Additionally, the ALJ's observation that Plaintiff was "largely objectively cooperative during her examinations, despite some subjective complaints of anxiety and/or depression" was supported by treatment notes from February and July 2024. Dkt. Nos. 9-3 at 32; 9-10 at 40, 63. Those notes described Plaintiff as "engaging" and "cooperative" despite documenting, respectively, "dysphoric" and "depressed" moods and "anxious" and "depressed" moods. Dkt. Nos. 9-3 at 32; 9-10 at 40, 63. These records further demonstrate that the ALJ's findings were derived from provider examinations rather than from an independent interpretation of unexplained medical data.

Plaintiff's treating-source records contain consistent, well-documented, and relevant evidence of Plaintiff's mental status and assessments of her mental and cognitive functioning through examinations. Dkt. No. 9-10 at 3–10, 23, 40, 47–51, 63, 68, 75–79. The ALJ relied on these assessments in formulating the RFC, expressly stating that the limitations were "based on the above." Dkt. No. 9-3 at 34. "[T]he determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor*, 706 F.3d at 603. "What [Plaintiff] characterizes as the ALJ substituting [her] opinion is actually the ALJ properly interpreting the medical evidence to determine [Plaintiff's] capacity for work." *Id.* (alteration in original). Substantial evidence supports Plaintiff's mental RFC.

### 2. There Was No Need for a Consultative Examination

Next, Plaintiff raises a related ground for remand that the ALJ erred by failing to develop the record by failing to order a "psychological consultative examination to

assess the Plaintiff's mental functional limitations." Dkt. No. 10 at 14. "An ALJ's decision to order a consultative examination is discretionary, and a consultative examination 'is required only if the record establishes that such an examination is *necessary* to enable the ALJ to make the disability decision.'" *Gonzalez v. Bisagnano*, No. EP-24-CV-00430-ATB, 2025 WL 3285498, at *10 (W.D. Tex. Nov. 25, 2025) (quoting *Brown v. Saul*, 858 F. App'x 711, 713 (5th Cir. 2021)) (citation omitted). There is no per se rule that an ALJ must order a consultative examination, and courts instead "rely on the duty of an ALJ 'to develop the facts fully and fairly relating to an applicant's claim for disability benefits.'" *Wills*, 2023 WL 4015174, at *3 (quoting *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)).

Furthermore, "[t]he ALJ's duty in this respect must be balanced against a claimant's burden of proving disability through Step Four of the disability determination, including the RFC stage." *Id.; see Brock*, 84 F.3d at 728 ("A consultative evaluation becomes 'necessary' only when the claimant presents evidence sufficient to raise suspicion concerning a non-exertional impairment.") (citing *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987)). A claimant's conduct before the ALJ can cut against a later challenge to the sufficiency of the record. *Vasquez*, 2024 WL 4381269, at *2 ("[Claimant]—who was represented by counsel before the ALJ and beyond—neither pressed for a consultative exam to assess her limitations nor offered medical testimony during her hearing. Those omissions undermine her arguments on record sufficiency now."). Here, Plaintiff appeared with counsel at the October 31, 2024, hearing, where her counsel affirmed that the record "should be

complete." Dkt. No. 9-3 at 99. At that hearing, Plaintiff neither requested a consultative examination nor presented medical testimony regarding her mental limitations. *Id.* at 96–122. Plaintiff has not demonstrated—then or now—why a consultative examination was necessary to develop the record. Plaintiff's own failure to meet her burden at the hearing and prove mental disability cannot now be used to sustain an argument for insufficiency of the record.

Yet even assuming *arguendo* that the ALJ erred by failing to develop the record further, reversal still requires a showing of prejudice. *Ripley*, 67 F.3d at 557. Plaintiff has not made such a showing. *See* Dkt. No. 10 at 10–17. "To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'" *Brock*, 84 F.3d at 728 (quoting *Kane*, 731 F.2d at 1220).

Plaintiff argues that a consultative examination could have offered "clarity" into Plaintiff's ability to perform the four basic mental demands of unskilled work identified in the Social Security Administration's Program Operations Manual System ("POMS").[7] Dkt. No. 10 at 15. Plaintiff also points to her depression diagnosis, and how it "may also limit exertion." *Id.* at 16. Dkt. No. 10 at 14–16. However, Plaintiff "argues only that additional evidence *could* have been taken, but omits *why* or *how* that evidence would have prompted a different RFC assessment. Mere speculation that a medical opinion could be additive to a record is not enough."

[7] The POMS consists of the Social Security Administration's "publicly available operating instructions for processing Social Security claims," and its interpretations "are not products of formal rulemaking." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 385 (2003). The Fifth Circuit accordingly recognizes that "the POMS is not binding law, because it is an unpublished policy statement." *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir. 1994).

*Vasquez*, 2024 WL 4381269, at *2. Bare assertions of potential prejudice are not enough to require reversal of the ALJ's decision. "The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error. A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden." *Jones*, 691 F.3d at 735; *see Watson v. Shalala*, 5 F.3d 1495 (5th Cir. 1993) (finding no prejudice where plaintiff had not indicated what evidence she would have introduced at the hearing to change the result of proceedings); *Stansel v. Shalala* 41 F.3d 664 (5th Cir. 1994) (same); *Galvan v. Berryhill*, No. 4:15-CV-3718, 2018 WL 993882, at *6 (S.D. Tex. Feb. 20, 2018) ("Plaintiff has not raised a suspicion concerning a non-exertional impairment that her depression or anxiety caused… That is because the record is entirely devoid of any such evidence."). Ultimately, even if we were to find that the ALJ had not sufficiently developed the record, Plaintiff has failed to demonstrate any prejudice resulting from that error. As such, there is no ground for reversal.

**C. The RFC Determination Was Internally Consistent**

Finally, the Court considers whether the ALJ's quota-related RFC language is internally inconsistent. The ALJ excluded "jobs requiring forced-pace quotas such as assembly line type of work" and clarified, "so yes to quotas, not the fast pace." Dkt. No. 9-3 at 34. Plaintiff characterizes this language as "internally inconsistent" and "confusing," arguing that "the ALJ does not explain how the RFC can simultaneously preclude and allow for quotas." Dkt. No. 10 at 18–19. Contextually, the RFC permits quota-based work only when meeting the quota does not require a forced or fast pace.

Courts have upheld similar distinctions between fast-paced production requirements and quotas that do not impose such pace demands. *See Pepper v. Comm'r of Soc. Sec. Admin.*, No. 22-1381, 2023 WL 3073532, at *2, *3 n.2 (4th Cir. Apr. 25, 2023) (per curiam); *Hess v. O'Malley*, 92 F.4th 671, 676, 678 (7th Cir. 2024); *M.T. v. Comm'r of Soc. Sec.*, No. 3:25-CV-00222, 2026 WL 1284875, at *2, *5 (S.D. Tex. May 11, 2026).

Findings from other circuits are particularly instructive in resolving any perceived internal conflict in the ALJ's RFC. The Fourth Circuit found an ALJ can limit a claimant to "simple, routine tasks performed two-hours at a time, but no fast-paced production rate work" and clarify that the limitation precludes "fast assembly line work." *Pepper*, 2023 WL 3073532, at *2, *3 n.2. In *Pepper*, the Fourth Circuit observed that such a limitation was clear because it "specif[ied] that the target is fast-paced work." *Id.* at *3 n.2 (internal quotation marks omitted). Similarly, the Seventh Circuit held that an ALJ can prohibit a "fast paced production quota or rate" while allowing production requirements that were "more goal oriented, such as based on a daily or weekly or monthly quota rather than assembly line work or other similar work." *Hess*, 92 F.4th at 676. In *Hess*, the claimant argued that the RFC did not account for his limitations in maintaining attention, following a schedule, and performing at a constant pace. *Id.* at 678. The Seventh Circuit upheld the RFC because it found that goal-oriented quotas measured productivity by completed goals, while the separate prohibition on fast-paced production made the work environment more responsive to the claimant's concentration and pace limitations. *Id.*

Another court in this district considered RFC language materially similar to that in the present case, providing that a claimant "could not perform work requiring [a] specific production rate (such as assembly line work) but can have an end of the day quota." *M.T.*, 2026 WL 1284875, at *2. Although the claimant challenged the RFC on a different ground, the court found the ALJ's decision supported by substantial evidence and free of legal error and affirmed the Commissioner's decision. *Id.* at *5. The ALJ in the present case was clear: "yes to quotas, not the fast pace." Dkt. No. 9-3 at 26. Accordingly, the Court finds that there are no internal inconsistencies in the Plaintiff's RFC determination.

## ***IV. Conclusion***

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, Dkt. No. 10, is **DENIED**, and the Commissioner's Cross-Motion for Summary Judgment, Dkt. No. 17, is **GRANTED**. The Commissioner's final decision is **AFFIRMED**.

IT IS SO ORDERED.

Signed this September 28, 2026, in Laredo, Texas.

Diana Song Quiroga
______________________________
Diana Song Quiroga
United States Magistrate Judge